# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EB5 HOLDINGS, INC., *et al.*,    :

            :

  Plaintiffs,      :   Civil Action No.:  23-1180 (RC)

            :

  v.         :   Re Document Nos.:  7, 9

            :

UR M. JADDOU,     :

            :

  Defendant.     :

## MEMORANDUM OPINION

### DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiffs EB5 Holdings, Inc., Gulf States Regional Center, LLC, and Sun Corridor Regional Center, Inc. (collectively, "Plaintiffs") bring the instant action against Ur Jaddou in her official capacity as Director of United States Citizenship and Immigration Services ("USCIS" or "Defendant").  Generally speaking, Plaintiffs allege that USCIS is violating the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–06, by requiring them to pay an annual fee that Congress enacted as part of the EB-5 Reform and Integrity Act of 2022, *see* Pub. L. No. 117-103, 136 Stat. 1070 (2022) (codified at 8 U.S.C. § 1153(b)(5)).  Plaintiffs have moved for summary judgment, and USCIS has cross-moved to dismiss.  For the reasons that follow, the Court denies Plaintiffs' motion for summary judgment and grants USCIS's cross-motion to dismiss.

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

In 1990, Congress established a program that sets aside visas for immigrants who help create jobs for American workers.  *See* Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978, 4987 (1990) (codified at 8 U.S.C. § 1153(b)(5)).  One of the ways in which an immigrant may qualify for one of these so-called "EB-5 visas" is by investing a large sum of money "in a commercial enterprise . . . that will directly create at least ten full-time jobs in the United States."  *Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 4 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023).

In 1992, Congress enacted an alternative path through which a foreign investor could qualify for an EB-5 visa.  Initially started as a pilot program, the new program enabled immigrant investors to "'satisfy the EB-5 employment-creation requirement by creating jobs indirectly' through a minimum investment into a designated 'regional center.'"  *Id.* at 5 (quoting *Bromfman v. U.S. Citizenship & Immigr. Servs.*, No. 21-cv-571, 2021 WL 5014436, at *2 (D.D.C. Oct. 28, 2021)); *see also* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395, § 610, 106 Stat. 1828, 1874 (1992) (codified at 8 U.S.C. § 1153 note).  A "regional center" is "any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment."  8 C.F.R. § 204.6(e) (2023).  Among other things, an entity seeking to become a designated "regional center" for EB-5 purposes must show how it "will promote economic growth" and "have a positive impact on the regional or national economy in general."  *Id.* § 204.6(m); *see also Da Costa*, 643 F. Supp. 3d at 5.

Although the regional center program was initially slated to sunset after five years, Congress regularly reauthorized the program for the better part of three decades. *See Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, No. 23-cv-119, 2023 WL 3863637, at *1 (D.D.C. June 7, 2023). Then, in June 2021, Congress let the program lapse. *See id.* Nine months later, Congress passed the EB-5 Reform and Integrity Act of 2022 (the "RIA"), Pub. L. No. 117-103, 136 Stat. 1070 (2022) (codified at 8 U.S.C. § 1153(b)(5)). In doing so, Congress "reformed" certain aspects of the regional center program that had been particularly susceptible to fraud and abuse, and also "reauthorized the . . . program through 2027." *See Del. Valley Reg'l Ctr.*, 2023 WL 3863637, at *1; *see also Da Costa*, 643 F. Supp. 3d at 5 (explaining that Congress was "[m]otivated in part by a desire to curb the corruption that had plagued regional centers for years"); *Mirror Lake Vill., LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring) (observing that the regional center program had been "well known for its susceptibility to fraud and abuse"); *Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-cv-02487, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022) (explaining that the RIA "reformed [the regional center program] substantially" by "adding dozens of pages of new statutory text and incorporating a series of reforms designed to strengthen oversight and combat fraud").

Among the many changes that Congress made to the regional center program through the RIA, one is particularly relevant here. In the RIA, Congress created the so-called "EB-5 Integrity Fund" (the "Fund"), *see* 8 U.S.C. § 1153(b)(5)(J)(i), and instructed that monies in the Fund shall be used to detect and investigate fraud, ensure regional center compliance with immigration laws, conduct audits and site visits, and for other specified purposes, *see id.* § 1153(b)(5)(J)(iii). To finance the Fund, Congress authorized the Secretary of Homeland Security (the "Secretary") to collect an annual fee (the "Integrity Fund Fee") from regional

centers on October 1, 2022 "and each October 1 thereafter." *Id.* § 1153(b)(5)(J)(ii)(I).  The size

of the fee varies depending on the number of investors contributing to the regional center.  *Id.*  A

regional center "with 20 or fewer total investors in the preceding fiscal year in its new

commercial enterprises" must pay $10,000 yearly, *id.* § 1153(b)(5)(J)(ii)(I)(bb), while regional

centers with more than 20 investors are required to pay $20,000, *id.* § 1153(b)(5)(J)(ii)(I)(aa).

The Secretary must assess "a reasonable penalty" upon any regional center that "does not pay the

fee . . . within 30 days after the date on which such fee is due." *Id.* § 1153(b)(5)(J)(iv)(I).  And if

a regional center fails to pay the annual fee within 90 days of the deadline, the Secretary is

required to "terminate the designation" of the non-compliant regional center. *Id.*

§ 1153(b)(5)(J)(iv)(II).

   In accordance with the statute, on March 2, 2023, USCIS published a "Notice in the

Federal Register announcing its plan to collect the EB-5 Integrity Fund fees [for fiscal year

2023] from 'designated regional centers.'" *EB5 Holdings, Inc. v. Jaddou*, No. 23-cv-1180, 2023

WL 4350085, at *1 (D.D.C. May 24, 2023) (quoting Notice of EB-5 Regional Center Integrity

Fund Fee, 88 Fed. Reg. 13141, 13142 (Mar. 2, 2023)).  The Notice stated that USCIS "w[ould]

begin collecting the fee for fiscal year 2023 . . . on March 2, 2023," and that "USCIS w[ould]

accept payment of the fee . . . for 30 days."[1]  Notice, 88 Fed. Reg. at 13142.  The Notice also

explained that, despite the statutorily mandated late-payment penalty, USCIS would "not charge

the late penalty in 2022" in an exercise of "its discretionary enforcement authority." *Id.* at

13143.  It clarified, however, that USCIS *would* "terminate the designation of any regional center

---

[1] The Notice acknowledged that, under the plain terms of the RIA, the fee would have
been due on October 1, 2022.  Notice, 88 Fed. Reg. at 13142.  In that vein, the Notice explained
that "[f]or fiscal year 2024 and each year thereafter," regional centers would need to pay the
annual fee "between October 1st and October 31st of the same year." *Id.*

that does not pay the full fee within 90 days after the date on which such fee is due." *Id.* USCIS stated that "[t]ermination w[ould] not be automatic." *Id.* Instead, "USCIS w[ould] provide a notice of intent to terminate and the opportunity for a regional center to prove that the fee was paid in the proper amount by the due date before sending a notice of termination." *Id.*

## B. Procedural Background

Plaintiff EB5 Holdings, Inc. ("EB5 Holdings") owns eight regional centers, including co-Plaintiffs Gulf States Regional Center, LLC ("Gulf States") and Sun Corridor Regional Center, Inc. ("Sun Corridor"). *See EB5 Holdings*, 2023 WL 4350085, at *1. On April 27, 2023, Plaintiffs filed a complaint in federal court challenging USCIS's decision to assess the annual fee on "*all* regional centers." Compl. at 1–2, ECF No. 1. They argued that, at least in the context of the annual fee, the RIA distinguishes between "legacy-Regional Centers"—that is, regional centers existing before the enactment of the RIA on March 15, 2022—and "post-March 15, 2022 regional centers."[2] *See id.* ¶¶ 30–31. At a high level, they contended that "as owners and operators of 'legacy-Regional Centers,'"[3] they were "exempt from the RIA's fee requirement." *See EB5 Holdings*, 2023 WL 4350085, at *1 (quoting Pls.' Mot. Prelim. Inj. at 3–4, ECF No. 2). Accordingly, they alleged that "[n]either Gulf States nor Sun Corridor ha[d] paid the [a]nnual RIA fee" and that they did not "intend[] on paying the fee on or by May 31, 2023." Compl. ¶¶ 50–51. As a result of their intended non-payment, Plaintiffs alleged that "USCIS w[ould] terminate their status as regional centers." *Id.* ¶ 52.

_____

[2] The RIA itself does not expressly distinguish between "legacy-regional centers" and "post-March 15, 2022" or "new" regional centers. However, the Court will at times use shorthand naming conventions such as these for ease of reference. The Court's use of such terms is strictly for convenience and should be interpreted as fully consistent with the Court's substantive analysis of the statutory provisions at issue.

[3] USCIS designated Gulf States and Sun Corridor as regional centers on January 13, 2014 and January 17, 2015, respectively. *See* Pls.' Mot. Summ. J. at 6, ECF No. 7.

Plaintiffs initially sought a preliminary injunction to enjoin USCIS from requiring payment of the annual fee "on or before May 31, 2023." Pls.' Mot. Prelim. Inj. at 1. The Court found, however, that Plaintiffs were unable to show that they would suffer irreparable harm absent an injunction because the alleged harms would "only come to pass if Plaintiffs refuse to pay the Integrity Fund Fee." *See EB5 Holdings*, 2023 WL 4350085, at *2; *see also id.* (explaining that "it is 'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted'" (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012))). Moreover, the Court explained that, "if Plaintiffs pay the Integrity Fund Fee and then prevail on the merits, they could seek damages" for the wrongful payment of the fee. *Id.* at *3. For these reasons, the Court denied Plaintiffs' motion for a preliminary injunction. *Id.*

While the preliminary injunction motion was still pending, Plaintiffs filed a motion for summary judgment. *See* Pls.' Mot. Summ. J. ("Pls.' MSJ"), ECF No. 7. Like their motion for a preliminary injunction, Plaintiffs' summary judgment papers argued that the RIA's annual fee provisions do not apply to "legacy-Regional Centers." *See id.* at 5, 8. They further argued that, to the extent USCIS intended to collect the annual fee from "*all* regional centers," USCIS would be "violat[ing] the plain language of the [RIA]." *See id.* at 5–6, 10. That being so, they asked the Court to "set[] aside the RIA Annual Fee Rule as it applies to legacy-Regional Centers." *Id.* at 10. USCIS opposed Plaintiffs' motion and filed a cross-motion to dismiss Plaintiffs' complaint. *See* Def.'s Opp'n Pls.' Mot. Summ. J. & Cross-Mot. Dismiss ("Def.'s Opp'n"), ECF No. 9. The parties' motions are fully briefed and ripe for review. *See* Pls.' Resp. Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n"), ECF No. 12; Pls.' Reply Supp. Mot. Summ. J. ("Pls.' Reply"), ECF No. 13; Def.'s Reply Supp. Cross-Mot. Dismiss ("Def.'s Reply"), ECF No. 16.

### C. Subsequent Developments

Following the completion of briefing, two events occurred that are relevant to analyzing the pending motions.  First, on May 25 and 26, 2023, respectively, Gulf States and Sun Corridor paid the annual Integrity Fund Fee.  *See* Def.'s Resp. Pls.' Notice Suppl. Authority ("Def.'s Suppl. Resp.") at 2, ECF No. 19; *see also* Ex. 1, Def.'s Resp. Pls.' Notice Suppl. Authority, ECF No. 19-1.  Second, on September 29, 2023, USCIS published an Alert on its website announcing that the fiscal year 2024 Integrity Fund Fee would be "due on or by October 1, 2023" and that the agency would begin terminating "any regional center that does not pay [the fee] on or by December 31, 2023."  *See* Pls.' Notice of Admin. Action at 1, ECF No. 20; *see also* Ex. 1, Pls.' Notice of Admin. Action at 1, ECF No. 20-1.  The record does not disclose whether Gulf States or Sun Corridor tendered payment of the fee on or before December 31, 2023.

### III.  LEGAL STANDARDS

### A. Rule 12

Federal courts are of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "Limits on subject-matter jurisdiction 'keep the federal courts within the bounds the Constitution and Congress have prescribed,' and those limits 'must be policed by the courts on their own initiative.'"  *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)).  Such limits are especially important in the agency review context, where "Congress is free to choose the court in which judicial review of agency decisions may occur."  *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Watts*, 482 F.3d at 505).  The law presumes that "a cause lies outside [the court's] limited jurisdiction" unless the party asserting jurisdiction

establishes otherwise.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).

In evaluating a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  But the court "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept [plaintiffs'] legal conclusions." *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).  A motion to dismiss under Rule 12(b)(1) "is not limited to the allegations of the complaint."  *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  And "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

Conversely, a motion to dismiss under Rule 12(b)(6) for failure to state a claim "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plaintiffs' factual allegations need not be "detailed," but

"the Federal Rules demand more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Iqbal*, 556 U.S. at 678).

### B. Rule 56

A court must grant summary judgment when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving review of agency action under the APA, however, Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011) (citations omitted). In this context, summary judgment instead "serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.*

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). That said, the scope of the court's review is narrow, and a court must not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, an agency's decision is presumed to be valid. *See Am. Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C. Cir. 1980).

# IV. ANALYSIS

## A. Threshold Issues

USCIS moves to dismiss Plaintiffs' claims, arguing that the Court lacks jurisdiction to hear those claims. Specifically, USCIS argues that Plaintiffs' claims are not yet ripe, *see* Def.'s Opp'n at 10–12, and, somewhat contradictorily, that Plaintiffs' claims are now "moot" in light of the fact that "Gulf States and Sun Corridor have paid the Integrity Fund Fee," Def.'s Suppl. Resp. at 2–3. USCIS also contends that Plaintiffs fail to state a claim under the APA because there has not been final agency action. *See* Def.'s Opp'n at 12–13. The Court will analyze USCIS's ripeness, finality, and mootness arguments before turning to the merits of the parties' claims. *See Schieber v. United States*, 77 F.4th 806, 809 (D.C. Cir. 2023) (explaining that "a federal court must confirm its subject-matter jurisdiction before reaching the merits"), *cert. denied*, No. 23-548, 2024 WL 156506 (U.S. Jan. 16, 2024).

### 1. Ripeness

First, USCIS argues that Plaintiffs' claims should be dismissed because they are not yet ripe. The Court disagrees.

Federal courts are vested with the power of judicial review extending only to "Cases" and "Controversies." U.S. Const. art. III, § 2. Courts have, over time, developed a series of so-called "justiciability doctrines" through which they "attempt to give meaning to Article III's case-or-controversy requirement." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). The concept of "ripeness" is one of these doctrines. *Id.* Under the ripeness doctrine, a federal court may not entertain a litigant's claims unless those claims are both "constitutionally and prudentially ripe." *Nevada v. Dep't of Energy*, 457 F.3d 78, 83 (D.C. Cir. 2006) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999)).

As to the former, "the plaintiff must establish constitutional minima akin to that of standing by showing an injury-in-fact." *Oregonians for Floodplain Prot. v. U.S. Dep't of Com.*, 334 F. Supp. 3d 66, 73 (D.D.C. 2018) (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1427); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (explaining that "[p]art of the [ripeness] doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending' (citation omitted)). Even when a plaintiff shows that a case is constitutionally ripe, there may still be "prudential reasons for refusing to exercise jurisdiction." *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).

USCIS does not appear to contest the constitutional ripeness of Plaintiffs' claims. *See* Def.'s Opp'n at 10–12. USCIS does, however, argue that the Court should decline to hear Plaintiffs' claims for prudential reasons. *See id.* Specifically, USCIS contends that, because USCIS has not yet terminated any regional centers for failure to pay the annual fee, there is "no possible way of determining whether the" harm alleged by Plaintiffs "will come to pass."[4] *Id.* at 11. The agency argues that, unless and until USCIS notifies Plaintiffs that it intends to terminate their regional center status for failure to pay the Integrity Fund Fee, Plaintiffs' claims are not ripe. *Id.* at 11–12.

To assess the prudential ripeness of a claim, courts "focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). In the context of APA actions, the first element—the

---

[4] The Court notes that USCIS made this assertion in May of 2023, and the present record does not make clear whether USCIS has terminated any regional centers for failure to pay the Integrity Fund Fee since that time.

fitness requirement—is primarily meant to protect "the agency's interest in crystallizing its

policy before that policy is subjected to judicial review" as well as the "court's interests in

avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Id.* (quoting

*Wyo. Outdoor Council*, 165 F.3d at 49).  Among other things, courts assessing whether an issue

is fit for decision consider whether the issue is "purely legal, whether consideration of the issue

would benefit from a more concrete setting, and whether the agency's action is sufficiently

final." *Id.* (quoting *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)).

　　　Here, there can be no serious question that Plaintiffs' claims pass this test.  For one thing,

Plaintiffs' claims present purely legal questions.  Their claims require the Court to determine, for

example, whether USCIS is acting outside of its authority by collecting annual Integrity Fund

Fees from regional centers established prior to passage of the RIA or, put slightly differently,

whether USCIS's interpretation of the annual fee requirement in 8 U.S.C. § 1153(b)(5)(J)(ii)(I) is

supportable.  As shown below, those questions are "purely legal" in the sense that resolving them

involves issues of straightforward statutory interpretation.  *See Pharm. Rsch. & Mfrs. of Am. v.*

*U.S. Dep't of Health & Hum. Servs.*, 138 F. Supp. 3d 31, 42 n.7 (D.D.C. 2015); *see also Atl.*

*States Legal Found.*, 325 F.3d at 284 ("Claims that an agency's action is arbitrary and capricious

or contrary to law present purely legal issues.").  That being so, there is no reason to think that

"further factual development of the issues presented," *Reckitt Benckiser Inc. v. EPA*, 613 F.3d

1131, 1137 (D.C. Cir. 2010) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726,

733 (1998)), or a "more concrete setting," *Am. Petroleum Inst.*, 683 F.3d at 387, would be

beneficial.  And in all events, since the date on which USCIS initially raised its ripeness

arguments, (1) USCIS has, in fact, collected Integrity Fund Fee payments from Plaintiffs, *see* Ex.

1, Def.'s Resp. Pls.' Notice Suppl. Authority, and (2) made clear that it will continue to do so on

an annual basis, *see* Ex. 1, Pls.' Notice of Admin. Action at 1–3; *see also In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993*, 720 F.3d 354, 359 (D.C. Cir. 2013) (explaining that "because 'ripeness is peculiarly a question of timing, it is the situation now . . . that must govern,' not the situation at the time the [challenged regulation] was published" (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974))).  These facts demonstrate the "finality" of USCIS's actions and "render[] further factual development unnecessary." *See In re Polar Bear*, 720 F.3d at 359.

USCIS resists this conclusion on two grounds.  First, the agency contends that Plaintiffs' claims are not fit for judicial review because Plaintiffs have not yet been issued "any Notices of Intent to Terminate" for failure to pay the Integrity Fund Fee.  *See* Def.'s Opp'n at 11; *see also* Def.'s Reply at 4 (arguing that, at the time, it was still unclear whether Plaintiffs would decide to pay the Integrity Fund Fee).  But Plaintiffs' complaint makes clear that, at the heart of this dispute, lies the question of whether USCIS may assess the Integrity Fund Fee on pre-RIA regional centers.  Given that Plaintiffs have *actually* paid that fee—a fee which they contend has been illegally imposed—USCIS's singular focus on the possibility of termination for *failure* to pay is too narrow.  For purposes of determining whether the issues presented are fit for judicial review, it is sufficient that USCIS has collected the Integrity Fund Fee from Plaintiffs Gulf States and Sun Corridor and made clear that it intends to continue to do so on a yearly basis.

Second, USCIS contends that, even if the issues are fit for review, Plaintiffs have not satisfied the "hardship prong" of the test for prudential ripeness.  Def.'s Opp'n at 11–12; *see* Def.'s Reply at 5.  The hardship prong comes into play when "a court has 'doubts about the fitness of an issue for judicial resolution.'" *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 514 F. Supp. 3d 290, 305 (D.D.C. 2021) (internal brackets omitted) (quoting *Consol. Rail Corp.*

*v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990)).  The Court has no such doubts here.  To the contrary, the Court concludes that the issues are "clearly fit for review" and thus, under the law of this circuit, "there is no need to consider 'the hardship to the parties of withholding court consideration,' because there would be no advantage to be had from delaying review."  *Action for Childs. Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995) (quoting *Abbott Lab'ys*, 387 U.S. at 148–49); *see Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011); *see also Garcia v. Acosta*, 393 F. Supp. 3d 93, 105 (D.D.C. 2019).  In short, to the extent USCIS moves to dismiss on ripeness grounds, its motion is denied.

### 2.  Final Agency Action

Next, USCIS contends that Plaintiffs' claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for lack of final agency action.[5]  *See* Def.'s Opp'n at 12.  In making this argument, USCIS primarily focuses on the Notice USCIS published in the Federal Register on March 2, 2023, *see* Notice, 88 Fed. Reg. 13141, and contends that that Notice does not represent final agency action.  *See* Def.'s Opp'n at 12–13.  In their opposition, Plaintiffs, too, focus singularly on that Notice.  *See* Pls.' Opp'n at 1–3.

 Under the APA, judicial review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; *see Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021).  The APA's finality requirement is "not jurisdictional."  *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  However, if final agency action is absent, then the plaintiff "lack[s] a cause of action under the APA."  *Id.*

---

[5] Though closely related, the doctrines of ripeness and finality are analytically distinct. *See Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010).

"Agency action is final 'if two independent conditions are met.'" *Bellion Spirits*, 7 F.4th at 1208 (quoting *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).  First, the action must mark "the consummation of the agency's decisionmaking process." *Id.* (quoting *Soundboard Ass'n*, 888 F.3d at 1267).  In other words, the agency's action must not be "of a merely tentative or interlocutory nature." *Id.* (quoting *Soundboard Ass'n*, 888 F.3d at 1267).  Here, it is clear that the Notice USCIS published in the Federal Register on March 2, 2023, was not interlocutory in nature, but rather represented a definitive pronouncement regarding the agency's intent to assess and collect the Integrity Fund Fee for fiscal year 2023.[6] *See generally* Notice, 88 Fed. Reg. 13141; *see also Arizona v. Shalala*, 121 F. Supp. 2d 40, 48 (D.D.C. 2000). Moreover, the Notice explained that USCIS did not view the annual fee provisions in 8 U.S.C. § 1153(b)(5)(J)(ii) as open to interpretation, at least insofar as those provisions require *all* regional centers to pay the Integrity Fund Fee.  *See* Notice, 88 Fed. Reg. at 13144 ("The statutory provision that requires the $20,000 and $10,000 fees contains little ambiguity for USCIS to resolve or explain.").  The fact that USCIS viewed section 1153(b)(5)(J)(ii) as lacking in ambiguity illustrates the non-tentative nature of USCIS's decision.  *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (finding that agency memorandum satisfied

---

[6] USCIS bases its argument that there has been no final agency action largely on the premise that the Notice USCIS published in the Federal Register is an "interpretive," rather than a "legislative," rule.  *See* Def.'s Opp'n at 12–13.  But, to the extent the Notice is an "interpretive rule," *see* Notice, 88 Fed. Reg. at 13144 (explaining that the Notice is either "a general statement of policy" or an "interpretive rule"), that fact alone does not bar judicial review, *see Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 55 n.5 (D.D.C. 2020) (rejecting agency's argument that interpretive rule was not "final agency action" because "that argument improperly conflates the finality analysis with 'the related but separate analysis of whether an agency action is a legislative rule'" (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634 (D.C. Cir. 2019))); *Arizona v. Shalala*, 121 F. Supp. 2d 40, 48 (D.D.C. 2000) ("[I]t is well established that an interpretative guidance issued without formal notice and comment rulemaking can qualify as final agency action." (collecting cases)).

the first prong of the finality analysis where "it advance[d] what [the agency] believe[d] [was] the *only permissible* interpretation of the statute").  And in all events, any reasonable question regarding whether USCIS had reached a final decision as to which entities are required to tender Integrity Fund Fee payments has surely been resolved given USCIS's actual collection of such payments from both pre- and post-RIA regional centers.

Having concluded that the Notice represented the final consummation of USCIS's decisionmaking process, the Court moves to the second prong of the test for finality.  That prong asks whether the agency action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bellion Spirits*, 7 F.4th at 1208 (quoting *Soundboard Ass'n*, 888 F.3d at 1267).  This is a "pragmatic" inquiry that considers "the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (first quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); and then quoting *Cal. Cmtys. Against Toxics*, 934 F.3d at 637).   Here, the Court concludes that the Notice satisfies the second prong of the finality inquiry because it represents agency action from which legal consequences flow.  Specifically, the Notice set a date by which regulated entities—that is, *all* regional centers—were required to pay the annual Integrity Fund Fee for fiscal year 2023.  *See* Notice, 88 Fed. Reg. at 13142.  That date differed slightly from the date required by the RIA. *See id.*  Furthermore, the Notice explained that USCIS would terminate the regional center status of any regional center that failed to tender payment within 90 days.  *See id.* at 13143.  Although the parties do not cite any evidence that USCIS has terminated any regional center for failure to pay the annual fee, there is no dispute that USCIS has, in fact, enforced the Notice to the extent that the Notice required all regional centers to submit the annual fee.  *Cf. Nat'l Mining Ass'n v.*

*McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (explaining that courts may consider events post-dating an agency's issuance of a guidance document in assessing whether agency treated that guidance as "binding on regulated parties").  Accordingly, there is sufficiently final agency action in this case to warrant judicial review under the APA.

### 3.   Mootness

Finally, USCIS argues that Plaintiffs' claims are now "moot because Gulf States and Sun Corridor have paid the Integrity Fund Fee."[7]  Def.'s Suppl. Resp. at 2–3.  In its own words, USCIS contends that, now that those entities have paid the annual fee for fiscal year 2023, "[t]here is . . . nothing to 'set aside' under the Administrative Procedure Act and declaratory relief will no longer prevent Plaintiffs from paying the Integrity Fund Fee."  *Id.* at 2.  USCIS concludes that "[i]f Plaintiffs wish to pursue this issue further and reclaim what they have already paid to USCIS as monetary damages, they will need to bring such a claim in the Court of Federal Claims."  *Id.* at 3.

USCIS's argument completely misses the mark.  In general, "[a] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 105 (D.C. Cir. 2016) (cleaned up).  In other words, a court must dismiss a case as moot if "events have so transpired [such] that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).  Courts have explained that when a plaintiff's "claims are founded on the invalidity of a

---

[7] USCIS further contends that, in light of those payments, Plaintiff EB5 Holdings also lacks associational standing to assert claims on Gulf States's or Sun Corridor's behalf.  Def.'s Suppl. Resp. at 2.

policy or regulation and 'that regulation no longer exists, the [c]ourt can do nothing to affect the [plaintiff's] rights relative to it, thus making the case classically moot for lack of a live controversy.'" *Chang v. United States*, No. 22-cv-352, 2023 WL 8697831, at *12 (D.D.C. Dec. 15, 2023) (cleaned up) (quoting *Akiachak Native Cmty.*, 827 F.3d at 106); *see also Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[B]ecause the [agency] already eliminated the [challenged policy] and plaintiffs never allege that the [agency] will reinstitute it, any injunction or order declaring it illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits."). Conversely, "a plaintiff's challenge will not be moot where it seeks declaratory [or injunctive] relief as to an ongoing policy." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009).

Here, Plaintiffs seek declaratory and injunctive relief to prevent USCIS from enforcing what, in Plaintiffs' view, is an "unlawful" and "arbitrary and capricious" interpretation of the RIA. *See* Compl. at 10–11. The premise of Plaintiffs' contention is that the RIA does not authorize USCIS to assess the annual Integrity Fund Fee on entities that, like Plaintiffs Gulf States and Sun Corridor, were designated as regional centers prior to the enactment of the RIA. *See* Pls.' MSJ at 8–10. To be sure, USCIS required Gulf States and Sun Corridor to pay the Integrity Fund Fee for fiscal year 2023, and those entities did, in fact, pay that fee. But the fact that Plaintiffs paid the fee for fiscal year 2023 does not moot Plaintiffs' challenges to USCIS's authority to require them to pay the fee *going forward*. And USCIS does not contend that it will cease requiring Plaintiffs to pay the Integrity Fund Fee in future years. Consequently, Plaintiffs' claims for injunctive and declaratory relief are not moot, *see Del Monte Fresh Produce Co.*, 570 F.3d at 321, and the Court will proceed to address the merits of those claims.

### B.  Merits

Moving to the merits, Plaintiffs argue that USCIS is acting contrary to law or in an arbitrary and capricious manner by requiring *all* regional centers—rather than just regional centers established after the enactment of the RIA—to pay the annual Integrity Fund Fee.  They argue that, in enacting the RIA, Congress did not intend that the Integrity Fund Fee be imposed on legacy regional centers.  *See* Pls.' MSJ at 8.  They contend that, by requiring pre-RIA-enactment regional centers (such as themselves) to pay the annual Integrity Fund Fee, USCIS is acting in direct contravention of Congress's express intent.  *See id.* at 10.  In other words, they argue that, to the extent USCIS interprets the RIA to grant the agency authority to collect the annual fee from legacy regional centers, that interpretation is erroneous and that USCIS is thus acting outside of its authority under the RIA.  The Court is not convinced.

When, as here, a plaintiff argues that an agency has erroneously interpreted "its authority to act under a statute," a court's analysis proceeds in two steps.  *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020); *see also Del. Valley Reg'l Ctr.*, 2023 WL 3863637, at *8.  First, the court considers "whether Congress has directly spoken to the precise question at issue."  *Baystate Franklin Med. Ctr.*, 950 F.3d at 92 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  To that end, the Court applies the "traditional tools of statutory construction" to determine whether Congress has "unambiguously expressed" its intent.  *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 380 (D.C. Cir. 2021) (quoting *Chevron*, 467 U.S. at 842–43 & n.9).  "If Congress's intent is clear, 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *Baystate Franklin Med. Ctr.*, 950 F.3d at 92 (quoting *Chevron*, 467 U.S. at 842–43); *see also Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 17 (D.C. Cir. 2022) ("If the statute

unambiguously resolves the question, that is the end of our inquiry.").  On the other hand, "if the statute is silent or ambiguous with respect to the specific issue," the court proceeds to the second step, at which point it "must uphold any agency interpretation that is 'reasonable.'"  *Solar Energy Indus. Ass'n v. FERC*, 59 F.4th 1287, 1292 (D.C. Cir. 2023) (quoting *Chevron*, 467 U.S. at 843–44).

Both parties contend that the statutory provisions at issue unambiguously evince Congress's intent.  Plaintiffs contend that the relevant provisions demonstrate that "Congress unambiguously intended to charge the [Integrity Fund Fee] only to" regional centers established after the enactment of the RIA.  *See* Pls.' MSJ at 9–10.  USCIS contends that the "plain language" of the provisions at issue demonstrates the opposite: that Congress clearly intended for all regional centers to be subject to the annual fee.[8]  *See* Def.'s Opp'n at 15–17.

To assess these competing interpretations, the Court begins with the text of the annual fee provision.  *See Am. Fuel & Petrochemical Mfrs.*, 3 F.4th at 380 (explaining that statutory construction "begins with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal brackets omitted) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004))).  In relevant part, the text of that provision provides that "[o]n October 1, 2022, and

---

[8] To the extent USCIS argues that its interpretation of 8 U.S.C. § 1153(b)(5)(J)(ii)(I) is supportable, it makes effectively no difference that USCIS chose to raise that argument through a cross-motion to dismiss rather than a cross-motion for summary judgment.  When, as here, "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law."  *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  Consequently, "there is no inherent barrier to reaching the merits at the 12(b)(6) stage." *Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226; *see also Am. Bioscience*, 269 F.3d at 1083–84 (collecting cases illustrating the proposition that "there [is] no real distinction between questions presented in Rule 12(b)(6) motion to dismiss and motion for summary judgment").

each October 1 thereafter, the Secretary of Homeland Security shall collect . . . an annual fee" of either "$20,000 *from each regional center designated under subparagraph (E)*" or "$10,000 from *each such regional center* with 20 or fewer total investors in the preceding fiscal year in its new commercial enterprises."  8 U.S.C. § 1153(b)(5)(J)(ii)(I) (emphases added).

 Plaintiffs' argument hinges on the phrase "regional center designated under subparagraph (E)."  *See* Pls.' MSJ at 9.  They contend that the phrase "regional center designated under subparagraph (E)" refers exclusively to regional centers established following enactment of the RIA, and that Congress used that phrase to "distinguish[]" between legacy regional centers and post-RIA regional centers.  *See id.* at 4, 9.  In Plaintiffs' view, this is because regional centers that existed pre-RIA did not need "to get re-designated" as regional centers following enactment of that statute.  *See id.* at 3.  Rather, such regional centers "remained authorized," and it was only new regional centers that, post-RIA, were required to seek "designat[ion] under subparagraph (E)."  *See id.*

 For multiple reasons, the Court does not agree.  For starters, the Court disagrees that section 1153(b)(5)(J)(ii)(I)'s reference to "regional center[s] designated under subparagraph (E)" unambiguously and exclusively refers to regional centers established following the enactment of the RIA.  To see why, start with subparagraph (E).  Based on the framework of Plaintiffs' argument, one might initially think that that subparagraph describes a process through which an entity becomes "designated" as an approved regional center for purposes of the EB-5 visa program.  It does not.  On the contrary, subparagraph (E) is comprehensive in scope.  First and foremost, subparagraph (E) provides the statutory source of authority for the regional center program as a whole.  *See* 8 U.S.C. § 1153(b)(5)(E)(i) (stating that "[v]isas under this subparagraph shall be made available . . . to qualified immigrants . . . pooling their investments

with 1 or more qualified immigrants participating in a program implementing this paragraph that involves a regional center in the United States, which has been designated by the Secretary"). It then goes on to set forth requirements for establishing a regional center, *see id.* § 1153(b)(5)(E)(iii), explain that regional centers must notify the Secretary of any "significant . . . changes" to their "organizational structure, ownership, or administration," *see id.* § 1153(b)(5)(E)(vi), and mandate that regional centers follow certain record keeping requirements and submit to periodic audits, *id.* § 1153(b)(5)(E)(vii). For the most part, then, subparagraph (E) applies to *all* regional centers, regardless of whether they were approved for participation in the regional center program before or after the passage of the RIA.

There is, however, one exception. That exception concerns section 1153(b)(5)(E)(iii)—the subsection of subparagraph (E) that sets forth criteria for *establishing* a regional center. *See id.* § 1153(b)(5)(E)(iii). Subsection 1153(b)(5)(E)(iii)'s provisions have little applicability to regional centers that existed prior to the enactment of the RIA given that such regional centers did not need to be reestablished following the Act's passage. *See Behring Reg'l Ctr.*, 2022 WL 2290594, at *4–6. But subsection 1153(b)(5)(E)(iii)'s provisions *do* have direct relevance to regional centers created in the wake of the RIA. Thus, to the extent Congress addressed section 1153(b)(5)(E) specifically to post-RIA regional centers, it did so through subsection 1153(b)(5)(E)(iii). Critically for Plaintiffs, however, the language on which their argument pivots—"regional center designated under subparagraph (E)"—does not reference subsection 1153(b)(5)(E)(iii) specifically. Instead, it refers to section 1153(b)(5)(E) generally. Though certainly not dispositive, this discrepancy cuts against Plaintiffs' argument that Congress's reference to section 1153(b)(5)(E) was meant to capture only those regional centers that came into existence following the enactment of the RIA. That is because, had Congress intended to

reference subsection 1153(b)(5)(E)(iii) specifically, it could have, and presumably would have, done so more explicitly.  *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017) (explaining that, when Congress wants to make "precise cross-references [or] refer only to a particular subsection or paragraph, it sa[ys] so"); *Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 461 (D.D.C. 2020) (same).

Another problem with Plaintiffs' interpretation of the statute is that section 1153(b)(5)(J)(ii)(I) is not the only section of the RIA that refers to "regional center[s] designated under subparagraph (E)."  Congress also used that phrase in section 1153(b)(5)(G).  Section 1153(b)(5)(G) requires a "regional center designated under subparagraph (E) [to] submit an annual statement" in which the regional center must certify that it remains in compliance with multiple other requirements found in section 1153, *see* 8 U.S.C. § 1153(b)(5)(G)(i)(I)-(III); must describe the policies and procedures it has enacted to ensure it remains in compliance "with applicable Federal labor laws," *see id.* § 1153(b)(5)(G)(i)(VII); and must provide "an accounting of all individual alien investor capital invested in the regional center," *see id.* § 1153(b)(5)(G)(i)(V).  The penalties for failing to submit an annual statement (or knowingly submitting a statement containing "an untrue statement of material fact") can be steep.  *See id.* § 1153(b)(5)(G)(iii).  A regional center found in violation may be temporarily suspended or permanently barred from participating in the regional center program.  *See id.* § 1153(b)(5)(G)(iii)(II).

It seems clear that the annual statement requirement (coupled with the potential for severe sanctions for a violation of that requirement) is meant to serve one of Congress's primary goals in enacting the RIA—that is, curbing the fraud, abuse, and "corruption that had plagued regional centers for years."  *See Da Costa*, 643 F. Supp. 3d at 5; *see also Del. Valley Reg'l Ctr.*,

2023 WL 3863637, at *1.  But on Plaintiffs' reading of the statute, that requirement—like the annual Integrity Fund Fee—would not apply to regional centers established prior to the enactment of the RIA.  *See* Pls.' MSJ at 3 (arguing that the RIA "does not require legacy-Regional Centers to file annual statements under subparagraph (G)").  After all, it is a fundamental canon of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning."  *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 180 (D.C. Cir. 2008) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)).  Thus, were the Court to interpret the words "regional center designated under subparagraph (E)" as synonymous with "new" regional centers, legacy regional centers would be exempt from the annual statement requirement.  Given Congress's overarching purpose in enacting the RIA, that result would make little sense.  *Cf. Cannon v. Watermark Ret. Communities, Inc.*, 45 F.4th 137, 149 (D.C. Cir. 2022) ("[W]hen possible, statutes should be interpreted to avoid . . . unreasonable results." (quoting *Kaseman v. District of Columbia*, 444 F.3d 637, 642 (D.C. Cir. 2006))).  Stated slightly differently, it would make little sense for Congress to enact a statute designed to cure pervasive fraud and abuse in the pre-existing regional center program while simultaneously exempting the entities that had participated in that program from complying with a provision of the statute specifically aimed at curing the fraud and abuse.  And if that *was* in fact Congress's intent, it is safe to assume that Congress would have expressed that intent much more clearly.[9]  *See Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("Congress does not hide elephants in mouseholes.").

---

[9] Relatedly, Plaintiffs argue that Congress intended to give pre-existing regional centers a choice: take affirmative steps to "opt in[]" to the "new regime" or "opt out" of that regime by "doing nothing."  *See* Pls.' MSJ at 4.  Plaintiffs offer no compelling evidence or analysis to explain why Congress would have chosen to make new compliance requirements optional for the approximately six hundred regional centers that had, for decades, been participating in a program

All that being so, the Court concludes that the phrase "regional center designated under subparagraph (E)" in section 1153(b)(5)(J)(ii)(I) does not unambiguously refer to regional centers established in the post-RIA era.  Instead, the Court agrees with USCIS that, in enacting the RIA, Congress expressed an unambiguous intent that the annual Integrity Fund Fee apply to both pre-existing and post-RIA regional centers alike.  This is apparent from the plain meaning of the phrase "regional center designated under subparagraph (E)."  *See* 8 U.S.C. § 1153(b)(5)(J)(ii)(I).  As explained above, subparagraph (E) is the section of the RIA that authorizes the regional center program as a whole.  *See id.* § 1153(b)(5)(E)(i).  Thus, in many ways, *all* entities that are authorized to participate in the regional center program are "designated" to do so pursuant to subparagraph (E).  This is especially so when one considers that the RIA does not contain any other provisions that could reasonably be construed to give the Secretary authority to "designate" an entity as a regional center.  And finally, reading the phrase "regional center designated under subparagraph (E)" as synonymous with "all regional centers" interprets that phrase in a way that is consistent with Congress's use of the same language elsewhere in the statute.[10]  *See supra* (discussing use of the phrase in section 1153(b)(5)(G)).

---

that was purportedly "rife with fraud."  *See Del. Valley Reg'l Ctr.*, 2023 WL 3863637, at *1. Again, the Court presumes that, had Congress sought to make certain aspects of the "new regime" optional, it would have clearly stated as much.

[10] In their reply brief, Plaintiffs cursorily assert that requiring pre-RIA regional centers to pay the annual Integrity Fund Fee may violate the presumption that statutes should not be interpreted to apply retroactively absent clear congressional intent.  *See* Pls.' Reply at 2; *see also Arnold v. Islamic Republic of Iran*, 787 F. Supp. 2d 37, 41–42 (D.D.C. 2011) (discussing the contours and application of the "presumption against retroactivity").  This assertion is both too little, *see Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."), and too late, *see Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) ("[B]ecause the District raised this argument for the first time in its reply brief, it is waived.").

In sum, the Court holds that section 1153(b)(5)(J)(ii)(I) unambiguously requires both pre- and post-RIA regional centers to pay the annual Integrity Fund Fee.  And because Congress unambiguously expressed its intent in this regard, that is the "end of [the Court's] inquiry."[11] *See Sault Ste. Marie Tribe*, 25 F.4th at 17.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 7) is **DENIED**, and Defendant's cross-motion to dismiss (ECF No. 9) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 20, 2024                                       RUDOLPH CONTRERAS
                                                               United States District Judge

---

[11] Plaintiffs do not argue—even in the alternative—that section 1153(b)(5)(J)(ii)(I) is (1) ambiguous and (2) that USCIS's interpretation is nonetheless unreasonable.  *See Solar Energy Indus. Ass'n*, 59 F.4th at 1292 (explaining that "'if [a] statute is silent or ambiguous with respect to the specific issue,' the court moves to step two and must uphold any agency interpretation that is 'reasonable'" (quoting *Chevron*, 467 U.S. at 843–44)).  Thus, even were the Court to conclude that section 1153(b)(5)(J)(ii)(I) is ambiguous, Plaintiffs would face a steep climb to prevail.